FILED

2021 Aug-23  PM 03:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| **TERRENCE STEWART,** | } | |
| | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| | } | |
| **v.** | } | **Case No.:  5:19-cv-01324-MHH** |
| | } | |
| | } | |
| **COVANTA HUNTSVILLE, INC.,** | } | |
| | } | |
| | } | |
| **Defendant.** | } | |

## **MEMORANDUM OPINION**

In this employment action, Terrence Stewart alleges that his employer, Covanta Huntsville, Inc., failed to promote him based on his race and retaliated against him after he complained about discrimination at the company.  Covanta has asked the Court to enter judgment in its favor on Mr. Stewart's claims.  (Doc. 31). This opinion resolves Covanta's motion.

The opinion begins with a discussion of the standard that a district court uses to evaluate motions for summary judgment.  Next, consistent with the summary judgment standard, the Court identifies the evidence that the parties have submitted

1

and describes the evidence in the light most favorable to Mr. Stewart. Then, the Court discusses the general analytical framework for employment discrimination and retaliation claims under Title VII and 42 U.S.C. § 1981. Finally, the Court evaluates the parties' evidence under that framework as it relates to Mr. Stewart's discrimination and retaliation claims to determine whether factual disputes in the record warrant a jury trial.

## I.

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, the party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

"A litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment." *United States v. Stein*, 881 F.3d 853, 857 (11th Cir. 2018); *see also Feliciano v. City of Miami Beach*, 707 F.3d 1244,

1253 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage.").  Even if a district court doubts the veracity of certain evidence, the court cannot make credibility determinations; that is the work of jurors.  *Feliciano*, 707 F.3d at 1252 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

When considering a motion for summary judgment, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in the non-moving party's favor.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).  Accordingly, the Court presents the summary judgment evidence in the light most favorable to Mr. Stewart and draws all inferences from the evidence in his favor.

## II.

The evidence in this case, viewed in the light most favorable to Mr. Stewart, is this:

Covanta owns and operates facilities across the country including a Huntsville, Alabama energy-from-waste facility.  Covanta Huntsville "offers a safe, technologically-advanced means of waste disposal that, at the same time, generates clean, renewable energy."  (Doc. 24, p. 1, ¶¶ 1–2).  Covanta Huntsville "burn[s]

municipal solid waste, which is household garbage converted into steam." (Doc. 23, p. 29).[1]

Mr. Stewart joined Covanta on April 9, 1995. (Doc. 23-3, p. 1). During the timeframe at issue in this case, Covanta Huntsville's workforce of 40 employees consisted of 37 white employees and three Black employees, including Mr. Stewart. (Doc. 1, p. 7, ¶ 32; Doc. 1-1, p. 4; Doc. 7, p. 4, ¶ 32; *see also* Doc. 24, p. 1, ¶ 1).[2] Mr. Stewart is an equipment operator or EO. Mr. Stewart described the position, stating: "I move the material around. The garbage that comes in, they dump it on the tipping floor and I take -- any load, I push it into the pit to be mixed by the Control Room. I also unload trucks as well and did that -- a lot of the years I unloaded trucks driving forklifts, but I was still considered a[n] equipment operator." (Doc. 23, p. 30). Mr. Stewart also keeps Covanta's grounds in good condition. (Doc. 23, pp. 30, 119).

Working on the tipping floor poses safety risks because it is a heavily travelled area. In his deposition, Mr. Stewart explained:

> You get an average of three hundred trucks or more up there every day. There's a risk of the equipment running over something that's in the trash and it being projectiled across it [*sic*] the floor. There's a risk of

---

[1] Citations to Mr. Stewart's deposition transcript, Doc. 23, reference the CM/ECF page number stamp, not the deposition transcript page number.

[2] The two other Black employees at Covanta during the timeframe relevant to Mr. Stewart's claims were John Brabson and Dewayne Walford. (Doc. 1-1, p. 4; Doc. 23, p. 31).

dust in the air.  There's a risk of other equipment that's running on the
floor as well, such as forklifts, that you have to watch out and you have
to watch out for a lot of personnel.  Because in most trucks, there's two
people in there, and one of them, they get out of the trucks once they
dump, to clean out the dump trays in their trucks.

(Doc. 23, pp. 43–44).

During his first two decades as an EO with Covanta, Mr. Stewart's supervisors

frequently rated him "commendable," "meet[ing] expectations," or "exceed[ing]

expectations."  For example, in 2001, Mr. Stewart's supervisor wrote that he "is our

best equipment operator."  (Doc. 23-3, p. 1).  In 2005, a supervisor wrote that Mr.

Stewart "is a valuable asset to Covanta Huntsville."  (Doc. 23-7, p. 2).  In 2008,

management described Mr. Stewart as "a great employee who fully demonstrates a

complete knowledge of his job and duties.  Mr. Stewart is a valuable member of our

Supplemental Waste team, and is truly an asset to Covanta Huntsville."  (Doc. 23-

10, p. 6).[3]  Still, no one suggested that Mr. Stewart should receive a promotion.

(Doc. 23, p. 110).

That changed in 2016 when Pamela Pruett began supervising the EOs at

Covanta Huntsville.  In Mr. Stewart's performance review for 2016, which Ms.

Pruett completed early in 2017, she gave Mr. Stewart an overall score of 4.0/5.0 –

---

[3] Lower marks on Mr. Stewart's reviews typically were related to his use of sick leave.  He received
lower scores in 2002 because he suffered an on-the-job injury and did not report it immediately.
(*See, e.g.*, Doc. 23-4, p. 12; Doc. 23-6, p. 3; Doc. 23-8, p. 2).

"Exceeds Expectations." (Doc. 25-1, p. 1).[4] She wrote that Mr. Stewart was "a very integral part of my team. He has the initiative, drive, and efficiency that makes him really good at what he does. I depend on him for a lot of things and he has helped me tremendously in my role. I am honored to have him as a part of my team." (Doc. 25-1, p. 1). Ms. Pruett scored Mr. Stewart's work as "expert" or as "significantly exceeds expectations" in several assessment categories. (Doc. 25-1, pp. 1–7).

Ms. Pruett commented that Mr. Stewart was "capable of operating in a lead position as his co-workers already look to him for guidance on almost a daily basis." (Doc. 25-1, p. 7). In a section labeled "Skills and/or Technical Competencies of Next Position(s) or Qualification Level(s)," Ms. Pruett wrote that Mr. Stewart "possesses the skills and competencies for a 'lead' Equipment Operator," or LEO, "should that become an option" and that he was "Ready now" for advancement. (Doc. 25-1, p. 7). In the portions of the evaluation that he completed, Mr. Stewart wrote that he took "great pride in [his] work area," that he had gone and would continue to go beyond what was asked of him, and that he was "ready now" for his next position at Covanta. (Doc. 25-1, pp. 1, 7).

---

[4] The 2016 review covers Mr. Stewart's performance between January 1, 2016 and December 31, 2016. (Doc. 25-1, p. 1). Mr. Stewart acknowledged the 2016 review on February 28, 2017. (Doc. 25-1, p. 1).

When Ms. Pruett wrote that Mr. Stewart had the skills to be a lead equipment operator, Covanta did not have an LEO position in Huntsville.  (Doc. 23, pp. 111, 126).  Ms. Pruett explained that "because there had been 'Lead' positions in other departments, I imagined it might be a possibility to create such a position in our department as well."  (Doc. 25, p. 3, ¶ 7).  After the 2016 review, Ms. Pruett asked Covanta's facility manager, Woody Wilson, if he would support creating an LEO position, but "[t]he conversation was brief and did not lead to anything further at that time."  (Doc. 25, p. 3, ¶ 9).

In 2017, Ms. Pruett began assigning Mr. Stewart additional responsibilities. Mr. Stewart and Ms. Pruett began meeting before he reported to his work station so that Ms. Pruett could instruct him on what to tell the other EOs.  (Doc. 23, p. 120). Mr. Stewart felt Covanta's expectations of him increasing, and he felt like he was serving in the LEO position "but not being compensated."  (Doc. 23, pp. 121–22). Mr. Stewart told Ms. Pruett:  "[I can't] keep doing this.  [] [Y]ou want me to be acting as the lead person, but I can't get paid for it and other employees who are white were getting paid for it."  (Doc. 23, pp. 122).[5]

_____

[5] In his deposition, Mr. Stewart acknowledged that he did not explicitly say that the other employees who he believed were compensated for acting in lead positions were white, but he used their names, and Ms. Pruett knew who he was talking about.  (Doc. 23, p. 123).

In his deposition, Mr. Stewart said that this conversation likely occurred in 2018, not 2017.  (Doc. 23, p. 125).  In notes of her conversations with Mr. Stewart, Ms. Pruett reported that Mr. Stewart

Ms. Pruett continued to advocate for Mr. Stewart. In June 2017, she contacted Sonia Coppedge, Covanta's regional human resources director, to discuss the LEO position. (Doc. 25, p. 3, ¶ 10). Ms. Coppedge confirmed that Covanta affiliates in other regions had an LEO position, and she and Ms. Pruett "concluded that it would be possible, from an HR perspective, to create the position." (Doc. 25, p. 3, ¶ 10). Mr. Wilson agreed and approved the new position. (Doc. 25, p. 4, ¶ 11). According to Ms. Pruett, Mr. Wilson told Mr. Stewart they were trying to get him (Mr. Stewart) an LEO position. (Doc. 25, p. 4, ¶ 12).

Ms. Pruett created an LEO job requisition for Covanta Huntsville and submitted it to George Ball-Llovera, Covanta's Regional Operations Manager for

―――――――――――――

told her on January 24, 2018 that he felt that he "'was discriminated against'" in 2017 because Covanta did not offer him an LEO position. (Doc. 25-3, pp. 1–2).

In his affidavit, Jason Walton, the Covanta Huntsville facility manager who replaced Mr. Wilson, stated that Covanta Huntsville has a mechanical lead position. With respect to the mechanical lead position, Mr. Walton explained:

> Unlike the LEO position, that has been in place for some time. Mr. Spence had been asking Brandon Givens to temporarily "step up" into the mechanical lead position for brief periods of time. This temporary work would occur, for instance, where coverage was needed because the regular lead was out.
>
> These "step-ups" were always temporary: once Mr. Givens finished his time working as lead, he would return to his permanent position. Likewise, when he temporarily "stepped up" into the lead position, he would receive the lead position's pay for all hours worked in that position. For all other hours worked, he received his regular pay for his regular position.

(Doc. 24, p. 13, ¶¶ 42, 43). Mr. Givens was not one of the three Black employees at Covanta Huntsville during the timeframe relevant to Mr. Stewart's claims.

the South Region, for approval.  (Doc. 25, p. 4, ¶ 12).  Mr. Wilson, Ms. Pruett, and Chris Spence – Covanta Huntsville's Chief Engineer – had a telephone call to discuss creating the LEO position for Mr. Stewart.  (Doc. 25, p. 4, ¶ 14).  Mr. Wilson and Ms. Pruett "made the pitch to create a[n] LEO position for Mr. Stewart, or to come up with some other reward, in recognition of the hard work that he had done."  (Doc. 25, p. 4, ¶ 14).  Mr. Spence recommended against the request "because of an issue he had had with Mr. Stewart several years ago."  (Doc. 25, p. 4, ¶ 14).  Ms. Pruett does not recall the specific issue Mr. Spence had with Mr. Stewart.  (Doc. 25, p. 5, ¶ 15).  After the telephone call, in an email to the call participants, Mr. Wilson wrote that what Mr. Stewart "may have done years ago is behind him with him stepping up and being a leader . . . Terrence shows pride in his work and the profiled waste program he is stepping up for is making us more money than everything else we do here."  (Doc. 25-2, p. 2).  Ultimately, Mr. Ball-Llovera "decided not to create a Lead Equipment Operator position at the [Huntsville] facility [because he] did not see a need to create a new position at the Facility at that time."  (Doc. 26, p. 2, ¶ 6; *see also* Doc. 23, pp. 142–43).

Ms. Pruett looked for other ways to recognize Mr. Stewart's efforts, suggesting some type of financial recognition for his work "above and beyond his job description."  She explained that Mr. Stewart:

9

> has become the kind of employee we should want throughout our
> facility.  He really cares about doing what is right and coming up with
> ways to do their jobs more efficiently on the tipping floor.  I completely
> understand if you don't want to use [the LEO] title in your Region but,
> as I mentioned yesterday, I would like to see us at least do something
> with his rate of pay or bonus that would reward him for his
> contributions above and beyond the norm.

(Doc. 25-2, p. 1).  Ms. Coppedge examined financial options and discovered that

Mr. Stewart already was the highest paid EO at Covanta Huntsville, that he already

had an hourly wage that exceeded the maximum hourly wage for EOs, and that

Covanta could not "give him a bump and keep him with the same job title since he's

already outside the range for EOs.  Unfortunately, even as a Lead EO, he's already

at the high end."  (Doc. 25-2, p. 2).

Ms. Pruett and Mr. Wilson met with Mr. Stewart and explained that Mr. Ball-

Llovera had denied the request to add the LEO position.  (Doc. 25, p. 5, ¶ 18).  Mr.

Stewart explained to Ms. Pruett:  "If they couldn't see that these other departments

had those positions that just because there wasn't one in [Mr. Ball-Llovera's] region.

This is what I stated to her, somebody got to be first."  (Doc. 23, p. 145).

After Mr. Stewart learned that Mr. Ball-Llovera had denied the request to add

an LEO position in Huntsville, Ms. Pruett noticed changes in Mr. Stewart's

demeanor at work:

He became a lot more withdrawn and, while he continued to meet the basic requirements of his job, did not go above and beyond in the way he had before. For example, he stopped volunteering for overtime when it was available. He also did not communicate proactively about work issues with me or others. Instead, he was a lot more reactive and would only respond when we specifically asked him about something. So for instance, if something was wrong on the tipping floor, before, he would usually let me or someone know. After this meeting where he learned he was not getting the LEO position, Mr. Stewart would not raise the issue but we would have to ask the right questions to get him to tell us. These trends started to become apparent before Mr. Stewart left on medical leave in September 2017, but became even more clear after his return.

(Doc. 25, p. 6, ¶ 19).

In September 2017, Mr. Stewart took disability leave after he suffered a collapsed lung. (Doc. 23, pp. 151, 154, 157). Before Mr. Stewart went on leave, Mr. Wilson retired from Covanta. (Doc. 23, p. 157). While Mr. Stewart was on leave, two noteworthy changes occurred at Covanta Huntsville: Jason Walton replaced Mr. Wilson as Covanta Huntsville's facility manager, (Doc. 24, p. 1, ¶ 3), and Ms. Pruett assigned some new responsibilities to Adam Partrick, one of Mr. Stewart's fellow EOs, (Doc. 25, pp. 6–8).

Ms. Pruett began giving new responsibilities to Mr. Patrick just as she had given Mr. Stewart to prepare him to become an LEO. Mr. Partrick, a white employee who had been working for Covanta for six years, began assisting Ms. Pruett with billing and quality assurance. (Doc. 24-9, p. 5; Doc. 25, pp. 6–8). In 2017, the new

responsibilities did not impact Mr. Partrick's income, and his job title did not change; he remained an EO.  (Doc. 25, p. 8, ¶ 25).[6]

Meanwhile, after learning that Mr. Wilson "conducted hiring and promotions in an informal, more ad-hoc manner," (Doc. 24, p. 2, ¶ 5), Mr. Walton opted for a standardized process for interviewing job applicants, and he instituted new procedures for evaluating job candidates.

> First, the position would be announced in three ways:  it would be posted in print on our bulletin board; it would be posted electronically on our website; and it would be announced at one of our Facility-wide meetings (which we called ''tailgates'').  After the position was announced, applicants would be required to submit an application consisting of a cover letter and a resume.  The hiring manager would then screen the applications to determine if the applicants were qualified.  I would then assemble an interview panel to interview the candidates who were qualified.  The interview panel would include several individuals who would bring a diverse range of perspectives and expertise to the table.  While I always included the hiring manager, I would also, for example, include a member of human resources who would be able to provide that expertise.

(Doc. 24, pp. 2–3, ¶ 7; *see also* Doc. 24, p. 2, ¶ 6).  With respect to hiring from within the company, Covanta's employee manual states:

> The Company is committed to providing career opportunities to its employees and will use reasonable efforts to consider internal candidates for vacant positions.  All selection decisions consider the applicants' qualifications, abilities and past work performance.  Only

---

[6] Eventually, after Covanta Huntsville created and filled the LEO position, Covanta posted a "an opening for a Quality Assurance/Quality Control position at Huntsville. The position reported to a manager at Covanta's corporate headquarters in New Jersey."  (Doc. 24, p. 14, ¶ 46).  "Mr. Partrick applied for and was awarded this position."  (Doc. 24, p. 14, ¶ 46).

job-related factors are considered.  In all selection and employment practices, the Company will provide all individuals with equal employment opportunity.

(Doc. 34, p. 14).

In 2018, just after the first of the year, Mr. Stewart returned to Covanta from leave.  (Doc. 24, p. 2, ¶ 4; Doc. 25, p. 8, ¶ 26; Doc. 23, p. 160).  In January 2018, Ms. Pruett and Mr. Stewart spoke several times.  Ms. Pruett made notes of her conversations with Mr. Stewart and emailed those notes to Mr. Walton on January 25, 2018.  (Doc. 25, p. 8, ¶ 27; *see* Doc. 25-3, pp. 1–3).  Mr. Walton forwarded the notes to Ms. Coppedge in HR.  (Doc. 25-3, p. 1; *see* Doc. 24, p. 4, ¶ 13).

In her notes, Ms. Pruett explained that on January 5, 2018, Mr. Stewart came into her office and said:  "[i]f anyone was getting a gravy job around here, it should be me!  I've been here the longest."  (Doc. 25-3, p. 2).  Mr. Stewart was referring to Mr. Partrick's new assignments helping Ms. Pruett with billing and quality assurance.  According to Ms. Pruett, Mr. Stewart remarked:  "I'll do my job, but that's it."  (Doc. 25-3, p. 2).  Mr. Stewart recalls that he told Ms. Pruett:  "I'm going to do what is assigned for me to do and I could only be responsible for me."  (Doc. 23, p. 166).  Mr. Stewart denies using the phrase "gravy."  (Doc. 23, p. 163).

On January 23, 2018, Ms. Pruett asked Mr. Stewart if he was willing to learn some of the clerical tasks that Mr. Partrick was doing for her.  (Doc. 25-3, p. 2; Doc.

23, p. 167).  Mr. Stewart declined because he wanted to "keep doing [his] job that's on the tipping floor."  (Doc. 23, p. 168).  The next day, Mr. Stewart told Ms. Pruett he had discovered that another Covanta location in the Southeastern Region listed an EO position that reported to an LEO.  (Doc. 23, p. 169; Doc. 25-3, p. 2).  Mr. Stewart told Ms. Pruett that he had been upset before he went on leave and stated: "I feel like I was discriminated against."  (Doc. 25-3, p. 2).  Ms. Pruett explained to Mr. Stewart that "those postings are created with templates and that it may be an error."  (Doc. 25-3, pp. 2–3).  According to Ms. Pruett's contemporaneous notes, Mr. Stewart told her that he was "the only long-time Huntsville employee that had not ever been promoted."  (Doc. 25-3, p. 3).[7]

Later that day, Ms. Pruett located the job posting that Mr. Stewart had mentioned.  The posting for an EO position in Tulsa, Oklahoma states:  "This position works under the direction of the Lead Equipment Operator."  (Doc. 25-4, p. 1).  Ms. Pruett contacted the Operations Assistant for the Tulsa, Oklahoma facility and asked if the facility had an LEO.  The Operations Assistant replied:  "Not at this

---

[7] Ms. Pruett asked Mr. Stewart if he had applied for a promotion, and he mentioned applying to be a "Loader," but Covanta did not promote him into that job.  (Doc. 25-3, p. 3).  Ms. Pruett explained to Mr. Stewart that the "Loader" or primary load operator position in which Mr. Stewart expressed interest was "not a specific position but [] a set of duties covered by an Equipment Operator." (Doc. 25, p. 12, ¶ 39).

In his deposition, Mr. Stewart testified that after he joined Covanta, he applied only for the LEO position that is the subject of this action.  (Doc. 23, p. 344).

time, but I heard they were working on it." (Doc. 25-4, p. 2). Mr. Stewart does not know whether the Tulsa facility had an LEO. (Doc. 23, pp. 191–92).

After Mr. Walton reviewed Ms. Pruett's notes of her conversations with Mr. Stewart, he spoke with Ms. Coppedge in HR and decided to ask Mr. Stewart about his (Mr. Stewart's) complaint of discrimination. (Doc. 24, pp. 5–6, ¶¶ 13, 18; Doc. 24-2, p. 1). After the conversation, Mr. Walton summarized his conversation with Mr. Stewart to Ms. Coppedge in a January 28, 2018 email:

> Went very well. I told him that I'm sorry if he was told that he was going to get the Lead Equipment Operator position. When we have positions that come available, anyone can apply on the position but all have to go through the qualifications review and formal interviews. I let him know that we will never tell someone that they have a position unless they have made it through the entire process and are officially offered the position.
>
> I assured him that we do not tolerate any form of discrimination and are constantly being observant of our actions to ensure everyone is being treated fairly. I asked if he still felt like he was discriminated against and he said that he would be lying if he told me no. So I asked if there was anything I could do to help and he said he was okay and that he would be fine, it would just take some time.
>
> I told him that my door is open and he can talk to me anytime. We shook hands and he told me thank you. Hopefully, the conversation will help to heal any wounds he may have and we won't hear anymore about it.

(Doc. 24-2, p. 1).[8]

---

[8] Mr. Stewart denies many of these conversations occurred or denies the dates on which they occurred or denies the contents of the conversations. During his deposition, Mr. Stewart stated:

On February 13, 2018, a few weeks after these conversations, Ms. Pruett reviewed Mr. Stewart's 2017 annual performance evaluation with him.  Ms. Pruett gave Mr. Stewart an overall score of 3.6/5.0 – "Exceeds Expectations" – and wrote:

> Terrence is a very experienced Equipment Operator.  He has worked in this role, here at Covanta Huntsville, for 22+ years.  He is well versed in the safe, efficient operation of all the Tipping Floor equipment.  He is a role model to our new tipping floor employees and spends a lot of time training and assisting them in learning and growing in their roles.  He has identified areas within our group to help us become more efficient and has taken appropriate steps to initiate the changes.  He takes pride in his job and it shows.  He is an asset to our department.

(Doc. 22-5, p. 1).  In the Career Development section of the evaluation, Ms. Pruett wrote that "[s]ince there is not a 'next level' within Tipping Floor Operations, Terrence could be ready for an advancement into Operations or Maintenance within 1-2 years (if desired)."  (Doc. 25-5, pp. 4–5).  According to Ms. Pruett, such a move would require specialized training.  (Doc. 25-5, p. 5).  She explained that if Mr. Stewart was interested in advancing in the Operations or Maintenance departments,

---

Q:    So it's your testimony that in addition to Mrs. Pruett fabricating contemporaneous notes regarding her conversations with you, that Mr. Walton was fabricating conversations -- his description of his conversation with you to Ms. Coppedge?

A:  This whole process has been one big cover up to cover the lies that were told by [Mr.] Ball-Llovera to start.  It's all been one big coverup.

(Doc. 23, p. 199).

16

"steps will be initiated to allow you the resources and time to train for the advancement." (Doc. 25-5, p. 5).

In his comments on the evaluation, Mr. Stewart wrote that he believed that he already was "ready to step into a leadership position." (Doc. 25-5, p. 5). Mr. Stewart explained:

> I feel that after working on the tipping floor 23 years that I am more that [*sic*] qualified to become the lead Equipment operator. I know we don't have this position as of yet at our plant. However, I strongly believe that we need such a person.
>
> The tipping floor is in my opinion the most dangerous area in the entire plant. Seeing that most of the workers are young men in their early twenties, they need someone like me to help them become great workers not good work [*sic*] I take pride in my job and worker area because it is a reflection of me.

(Doc. 25-5, p. 5).

On May 3, 2018, an EO driving a forklift on the tipping floor almost ran over Mr. Stewart's foot. (Doc. 24, p. 7, ¶ 19; Doc. 25, p. 16, ¶ 50). Mr. Walton gave Mr. Stewart a safety coaching about the incident, and he gave the forklift operator a one-day suspension. (Doc. 24, p. 7, ¶¶ 20-21; Doc. 24-3). Following this incident, Mr. Walton "had several conversations with Ms. Pruett and with Kevin Pliska, the Area Operations Manager" and Mr. Walton's direct supervisor, "to assess the Facility's tipping floor operations." (Doc. 24, p. 7, ¶ 22). According to Mr. Walton, at one point, Mr. Pliska asked him "who our lead person on the tipping floor was. I told

him that we did not have a lead. Mr. Pliska reacted immediately: 'You need a lead.' Mr. Pliska was pretty adamant about the decision and clear that this needed to change." (Doc. 24, p. 7, ¶ 22). Mr. Pliska recommended the LEO position to Mr. Ball-Llovera, and Mr. Ball-Llovera approved the new position. (Doc. 27, p. 3, ¶ 9; Doc. 26, p. 3, ¶ 9).

On June 12, 2018, Mr. Walton authorized Ms. Coppedge to open a requisition for the new LEO position. (Doc. 24-4, p. 1). He wrote:

> Scott agrees to changing one of the EO's to Lead EO. So, we are going through the process of posting the Lead EO position. It will have to make it through Kevin [Pliska] and George [Ball-Llovera].
>
> The Plan is to interview/discuss the position with all of the EO's so they know the roles, responsibilities and expectations. Also, the pay for the position…our EO's are already at the top of the scale, so that makes incentivizing them difficult.

(Doc. 24-4, p. 1). According to data that Ms. Coppedge provided to Mr. Walton, Mr. Stewart, at $27.16 per hour, was the highest paid EO at the Huntsville facility, (Doc. 24-4, p. 2), but he was paid only 45 cents per hour more than Mr. Partrick, who Covanta paid $26.71 per hour, (Doc. 24-4, p. 2). By June of 2018, Mr. Stewart had worked as an EO for Covanta for 23 years, and Mr. Partrick had worked for the company for six years and had transitioned from an auxiliary operator to an EO in March of 2016. (Doc. 23-3, p. 1; Doc. 24-9, p. 5). Covanta paid Mr. Perry, who had worked for the company for two years as an EO, $26.11 per hour. (Doc. 24-4, p. 2;

18

Doc. 24-9, p. 9).  Covanta paid Mr. Monahan, who had joined Covanta Huntsville as an EO a few weeks before Ms. Coppedge presented the wage data, $24.99 per hour.  (Doc. 24-4, p. 2; Doc. 24-9, p. 13).[9]

On July 2, 2018, Covanta posted the LEO job listing.  (Doc. 23-21, p. 1).  The posting indicated that the LEO would "be responsible for leading and directing the day to day activities of Equipment Operators."  (Doc. 3-21, p. 1).  The posting stated:

> Located at the Huntsville, AL facility, we seek a dedicated individual who, reporting to the Supplemental Waste Program Manager, will be responsible for leading and directing the day to day activities of the Equipment Operators. The Lead Equipment Operator will provide technical assistance and training to the Equipment Operators. Hands on duties include current Equipment Operator duties, in addition to the responsibilities of the Lead Equipment Operator. Ensures inspections are conducted on a daily basis, and corrective action initiated for any noted deficiencies on the equipment. Ensure EO's are safely and efficiently operating all equipment (forklifts, loaders, sweepers, hoppers, docks, etc.). Continuously monitor the condition of the equipment to ensure it is operationally ready at all times to minimize down time. Follow and enforce all required Covanta safety policies and procedures. Monitor E/O's use of all safety features on the equipment (seatbelts, cameras, sensors, alarms, etc.) to ensure compliance. Ensure tipping floor, dock area, and grounds are clean and well maintained. Schedule EO's to complete all required GPiLearn lessons and encourage them to take additional lessons to further their understanding of plant operations. Recommend measures to improve production and efficiency. Utilize schedule to manage unloading of trucks, as scheduled. Ensure loads are processed in the required manner (pit,

---

[9] According to Ms. Pruett, the EO position that Covanta hired Mr. Monahan to fill "was created on March 20, 2018."  (Doc. 38, p. 2, ¶ 6).  Mr. Monahan indicated in his application for the LEO position that he worked for Madison Lumber Company in Alabama from "October 2017 to May 2018."  (Doc. 24-9, p. 13).  Therefore, the Court infers that Mr. Monahan did not join Covanta until some point in May of 2018, weeks before Mr. Walton authorized Ms. Coppedge to open a requisition for the new LEO position on June 12, 2018.  (Doc. 24-4, p. 1).

hooper, witnessed, etc.). Monitor waste to ensure we are not receiving unapproved items. Confer with Manager to coordinate activities of individual tasks or shifts. Lead by example and motivate EO's to face challenging situations in a safe, positive, and efficient manner. Work diligently to create a cohesive work environment within department as well as with Operations and Maintenance. Perform other job-related duties as assigned.

(Doc. 23-21, p. 1). Ms. Pruett and Mr. Walton visited the tipping floor and told the EOs about the position. (Doc. 23, pp. 211–13; Doc. 24, p. 8, ¶ 26). Mr. Walton said that the application process "would not be a 'good ole boy' thing like under [his] predecessor." (Doc. 23, pp. 211, 213; Doc. 24, p. 8, ¶ 27). Mr. Stewart testified that Mr. Walton looked directly at him when he made his "good-ole-boy" statement. (Doc. 23, p. 214).

Four of the five Huntsville EOs applied for the LEO position: Mr. Stewart, Ron Monahan, Anthony Perry, and Adam Partrick. (Doc. 24, p. 9, ¶ 28; Doc. 23, p. 215).[10] In his application letter and in his resume, Mr. Stewart highlighted his 23 years of experience as an EO and referred to his personnel records (which, as mentioned, pointed out that Mr. Stewart had been performing the duties of an LEO). (Doc. 24-9, pp. 1–2). Mr. Stewart also pointed out that he had served as the VPP President. The VPP was a Covanta safety committee that met monthly. (Doc. 23-

---

[10] As discussed below, the fifth EO was ineligible for promotion because of a safety violation.

1, p. 2).[11]  When they submitted their applications, Mr. Perry and Mr. Partrick had worked at Covanta as EOs for two years.  (Doc. 24-9, pp. 5, 9).  In his three-sentence application letter, dated approximately two months after his arrival at Covanta Huntsville, Mr. Monahan stated:

> I am applying for the equipment operator leadman position.
>
> I am interested in this position because I was the leadman in the Braintree MA facility for the past 3 years before moving to Alabama.
>
> Resume enclosed; thank you for your time and consideration.

(Doc. 25-9, p. 12).  Mr. Monahan had worked at SEMASS/Covanta Energy from 1996 to 2017.  While at SEMASS, he worked as a scale operator, a utility operator, a heavy equipment operator, and a heavy equipment supervisor before becoming the Transfer Station Leadman at SEMASS in 2014.  (Doc. 24-9, pp. 12–13).[12]

Mr. Walton reviewed the four applications, determined that each EO met the qualifications for the LEO position, and assembled a panel to interview each

---

[11] Several of Mr. Stewart's annual reviews mention his work on the VPP Safety Committee.  (Doc. 23-8, pp. 2, 4 (2006 review); Doc. 23-9, p. 2 (2007 review); Doc. 23-10, pp. 2, 4 (2008 review – Mr. Stewart was elected VPP president for 2009); Doc. 23-11, p. 1 (2009 review – "Mr. Stewart was VPP president this year and conducted safety walkdowns of the facility."); Doc. 23-15, p. 3 (2015 review – "Mr. Stewart has been the VPP president and attends all weekly and monthly safety meetings. He is committed to the safety culture at Huntsville.  Mr. Stewart communicates well with his supervisor and fellow equipment operators.")).

[12] Mr. Stewart submitted a detailed application letter and formal resume.  So did Mr. Partrick and Mr. Perry.  In addition to his three-sentence cover letter, Mr. Monahan submitted summary notes for his "resume."  (Doc. 24-9, pp. 1–13).

candidate.  (Doc. 24, p. 9, ¶¶ 28–29).  Mr. Walton, Ms. Pruett, Kimberly Achey – a Covanta Operations Assistant in the HR department, and Steven Rottmann – the Lead Electrical and Instrument Technician, were on the panel.  (Doc. 24, p. 9, ¶ 29; Doc. 23, p. 222).  Mr. Walton included Mr. Rottmann on the panel because his position as a lead gave him "a good understanding of the particular skills required to successfully perform the duties of a lead position," and he was "well-equipped to evaluate candidates' ability to serve in a lead position."  (Doc. 24, p. 9, ¶ 29).

At the beginning of each interview, Mr. Walton gave opening remarks and explained the interview process.  (Doc. 24, pp. 9–10, ¶ 30).  The interviewers asked the four EOs 20 behavioral interview questions Mr. Walton had developed.  (Doc. 24, p. 10, ¶¶ 30–31).  Mr. Walton explained that because the questions were behavioral, "they were designed to assess an interviewee's interpersonal and leadership capacities – for example, how they solve problems, supervise others, and resolve conflicts.  These behavior questions were not job-specific.  They did not ask about technical aspects of a specific job or workplace."  (Doc. 24, p. 10, ¶ 31).  Each of the four interviewers gave Mr. Stewart the lowest interview scores of the four EOs.  (Doc. 24-5, pp. 1–4; Doc. 25-10, pp. 1–4; Doc. 29-4, pp. 1–4; Doc. 30-4, pp. 1–4).  Mr. Monahan scored highest in the interviews, and Covanta promoted him to the LEO position.  (Doc. 24, pp. 12–13, ¶ 40).  In Mr. Walton's opinion, Mr. Monahan "had the most relevant experience of all of the candidates because he had

worked as a lead at a similar Covanta facility in Massachusetts." (Doc. 24, pp. 12–13, ¶ 40).

Before Covanta Huntsville hired Mr. Monahan as an EO in May of 2018, Mr. Monahan had twice applied unsuccessfully for EO positions at Covanta Huntsville. (Doc. 38, p. 2, ¶¶ 4, 5). When he applied for an EO position Covanta created in January 2017, the company did not interview him because he was overqualified "as he had already served in a Lead position at a different Covanta facility." (Doc. 38, p. 2, ¶ 4). Covanta interviewed Mr. Monahan for another EO position that the company created in August 2017, but he "was *overqualified* for this position given his prior experience." (Doc. 38, p. 2, ¶ 5) (emphasis in declaration). Within three months of Covanta Huntsville hiring him as an EO, Mr. Monahan assumed his duties as LEO, and he became Mr. Stewart's supervisor. Mr. Monahan came to Mr. Stewart for guidance, asking him for advice about recycling and other aspects of the tipping floor work. (Doc. 23, p. 235).

On August 31, 2018, Mr. Stewart filed a charge of discrimination with the United States Equal Employment Opportunity Commission.[13] Mr. Stewart wrote:

> My name is Terrence E. Stewart, and I am a Black African American male. I began working for Covanta Huntsville Inc. as an Equipment Operator in April of 1995, for 40+ hours per week plus benefits. My

---

[13] Mr. Stewart signed his charge on August 31, 2018, and the EEOC marked it received on September 4, 2018. (Doc. 1-1, p. 2).

current direct report supervisor is Pamela Pruett (White/Caucasian), and my current manager is Jason Walton (White/Caucasian).  My prior manager was Woodrow Wilson (White Caucasian) who retired in August of 2017.

I have consistently been rated as exceeding expectations as part of my annual reviews in 2015, 2016 and 2017.  On my 2016 Annual Review, my manager indicated that I currently possessed the skills and competencies for a lead Equipment Operator, and that I was already operating in a lead position as my co-workers already looked to me for guidance on almost a daily basis.  On my 2017 Annual Review, my manager concluded since there is not a next level within Tipping Floor Operations, that I could be ready for advancement into Operations or Maintenance within 1-2 years, if desired.

After Woodrow Wilson retired in August 2017, I acted as the Lead Equipment Operator pending a decision about his replacement.  Prior to his retirement, Pamela and Woodrow had discussed promoting me into the position.  They agreed on the promotion, but said they had to get approval from the Regional Manager for the Southeastern Region.  When they discussed it with that Regional Manager, he told them that he did not have such a position in his region.  I checked and found a posting for an opening for an Equipment Operator who reported to the Lead Equipment Operator at another Covanta Plant within the region.  I continued to act as the Lead Equipment Operator, as there was a necessity for someone to step up and direct the newer employees and keep the department running smoothly until I had to leave work for a temporary disability (a collapsed lung) on or about September 27, 2017.

While I was out on disability leave, a new Equipment Operator was hired, Jacob Holt (White/Caucasian).  When an Auxiliary Operator position came up in late January or early February 2018, Jacob Holt was given the position, which pays $2 to $3 more per hour than the position of Equipment Operator.

I returned to work on or about January 2, 2018.  On July 2, 2018, Jason Walton announced that the company was hiring a Lead Equipment Operator, and they were considering four people for the job:  Adam Patrick [*sic*] (White/Caucasian), Anthony Perry (White/Caucasian), Ron Monihan [*sic*] (White/Caucasian), and myself.  At the end of the meeting, Jason Walton looked right at me and said it wasn't going to

be one of those "good ole boy" things.  The job was not posted company-wide, which was the policy, but only made known at the Huntsville plant.

I interviewed for the position, but it was not given to me, even though I had seniority with the company and the most experience.  Jason Walton told me that I did not get the job because my answers were "vague."  However, two of the persons who were conducting the interviews were not familiar with the position of equipment operator, so it will sound vague if you don't know the job.

Ron Monihan [*sic*] was promoted into the position.  Ron had only been working as an Equipment Operator there for 90 days when he was promoted.  I was told he had prior supervisory experience and had been a marine, but I had to train him for the job.

In fact, Pamela Pruett asked me to create a Tipping Floor Housekeeping Plan, which was then given to Ron so he would know what his job consisted of.  Pamela is still asking me to help bring Ron "up to par."

I believe I was overlooked for the promotion based on the culture of discrimination at this workplace.  For instance, in the last more than 20 years that I have worked at the Huntsville site, approximately 27 white/Caucasian employees have been hired but only 1 black African American employee.  Out of 40 or so local employees, there are currently only 3 Black African American employees:  John Brabson, Dewayne, and myself.  Approximately 4 or 5 years ago, Pamela Pruett's husband Tony (White/Caucasian), was working as a subcontractor for the company.  He presented a noose made of real rope to John Brabston, and said "don't make me use this."  The company barred him from the job site and company functions, but Jason Walton allowed him to come to the company Christmas party in 2017.

(Doc. 1-1, pp. 2–4).

After Mr. Stewart filed his EEOC charge, he continued to work at Covanta.

Mr. Stewart's 2018 performance evaluation covers the period between January 1,

2018 and December 31, 2018.  (Doc. 25-11, p. 1).  Ms. Pruett gave Mr. Stewart a

1.8/3.0, "Meets Expectations" for her overall evaluation.   (Doc. 25-11, p. 1).

Between the 2017 evaluation and the 2018 evaluation, Covanta changed its review

format from a 5-point scale to a 3-point scale.  "While, previously, a 3 point rating

had been meets expectations and a 4 point rating had been exceeds expectations,

now, a 2 point rating was meets expectations, and a 3 point rating was exceeds

expectations."  (Doc. 25, pp. 19–20, ¶ 67).  In Mr. Stewart's 2018 evaluation, Ms.

Pruett wrote:

> Terrence returned to work on 1/2/2018 after being on leave most of the
> 4th quarter of 2017.  There were some changes regarding the PW
> paperwork that took place during his absence that didn't sit well with
> him.  We discussed his concerns and he was asked if he would be
> willing to learn the process for matching the scale ticket and paperwork
> for billing and perform that function when needed but he declined.  He
> became very withdrawn and critical of his co-workers over the next
> couple of months.  Around the end of March, he was starting to rebound
> and seemed more engaged within the department.   On May 3rd,
> Terrence was involved in a serious near-miss on the Tipping Floor and
> received documented coaching.   In July 2018, a 'Lead Equipment
> Operator' position was approved.  Terrence applied, along with 3 of his
> co-workers.  All 4 of them held the technical competencies to perform
> the duties but another employee, with experience as a Lead Equipment
> Operator, was selected.   This proved to be a setback that Terrence
> struggled to overcome throughout 2018.  This affected his performance
> and he became almost totally disengaged.  He still performed the duties
> that were required of him but he did not perform at the level he had in
> previous years.  He no longer talked with his supervisor or the Facility
> Manager unless he was specifically asked a question and discontinued
> participating in Company functions (cookouts, Thanksgiving &
> Christmas luncheons, etc.). A slight improvement in communication
> was noted during the last week of December, but still needs
> improvement.    Terrence experienced a lot of change and

disappointment in 2018 that I hope he will be able to overcome and rise back up to the 'exceeds expectations' employee that I know he can be.

(Doc. 25-11, p. 1).   Ms. Pruett noted that Mr. Stewart "has the technical competencies that are required for the next qualification level within our department" and that he should "[c]ontinue to perform his job at the high level of expertise that he has previously."  (Doc. 25-11, pp. 3–4).

Mr. Stewart ultimately told Ms. Pruett that he was interested in the primary load operator responsibilities.  Ms. Pruett transitioned him to that role in late 2019 or early 2020, and he was performing those duties as of January 2021.  (Doc. 25, p. 12, ¶ 39).  Mr. Stewart filed his complaint in this matter on August 15, 2019.  (Doc. 1).  He states claims for race discrimination and retaliation against Covanta.  (Doc. 1).

### III.

**Mr. Stewart's Title VII Claims**

#### A. EEOC Exhaustion

Covanta contends that the scope of Mr. Stewart's Title VII claims is narrow because he did not properly exhaust some of his Title VII theories before he filed his federal complaint.  Before he files a Title VII action, "a plaintiff first must file a charge of discrimination with the EEOC."  *Gregory v. Georgia Dep't of Hum. Res.* 355 F.3d 1277, 1279 (11th Cir. 2004) (citing *Sanchez v. Standard Brands, Inc.*, 431

F.2d 455, 460 (5th Cir. 1970)).  "The purpose of this exhaustion requirement 'is that the [EEOC] should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts.'"  *Gregory*, 355 F.3d at 1279 (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir. 1983)) (alteration in *Gregory*).  The Eleventh Circuit Court of Appeals "has noted that judicial claims are allowed if they 'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate."  *Gregory*, 355 F.3d at 1279–80 (quoting *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)).

"In light of the purpose of the EEOC exhaustion requirement," the Eleventh Circuit has held that "a 'plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'"  *Gregory*, 355 F.3d at 1280 (quoting *Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000)).  "Courts are nonetheless 'extremely reluctant to allow procedural technicalities to bar the claims brought under [Title VII].'"  *Gregory*, 355 F.3d at 1280 (quoting *Sanchez*, 431 F.2d at 460–61) (alteration in *Gregory*).  The Eleventh Circuit "has noted that 'the scope of an EEOC complaint should not be strictly interpreted.'"  *Gregory*, 355 F.3d at 1280 (quoting *Sanchez*, 431 F.2d at 465).  "To determine whether a plaintiff has exhausted [his]

administrative remedies, then, the 'proper inquiry' is whether the '[plaintiff's] complaint is like or related to, or grew out of, the allegations contained in [the] EEOC charge.'"  *Batson v. Salvation Army*, 897 F.3d 1320, 1328 (11th Cir. 2018) (quoting *Gregory*, 355 F.3d at 1280).

As it relates to his Title VII claim for race discrimination, Mr. Stewart began his EEOC charge with a description of Mr. Wilson's and Ms. Pruett's unsuccessful 2017 campaign for Covanta to create an LEO position for him and then turned to his allegation that he was passed over for promotion to the LEO position in 2018 because of his race, stating:  "I believe I was overlooked for the promotion based on the culture of discrimination at this workplace." (Doc. 1-1, pp. 2–4).  Mr. Stewart's complaint closely tracks the factual allegations concerning race discrimination in his EEOC charge.  (Doc. 1, pp. 3–7; Doc. 1-1, pp. 2–4).  Because Mr. Stewart's allegations of race discrimination in his complaint are "like or related to" the allegations of race discrimination in his EEOC charge, in his administrative proceedings, he properly disclosed his allegations of race discrimination concerning his inability to obtain an LEO position in 2017 and 2018.

Still, Covanta correctly argues that Mr. Stewart cannot recover damages for Title VII race discrimination based on Covanta's refusal to create an LEO position for him in 2017 because Mr. Stewart did not file a timely EEOC charge concerning the 2017 conduct.  (Doc. 31-1, p. 16 n.4).  In *Reed v. Winn Dixie, Inc.*, the Eleventh

Circuit Court of Appeals explained that plaintiffs have limited time in which to file an EEOC charge.  677 Fed. Appx. 607, 610 (11th Cir. 2017).  "For a charge to be timely in Alabama, a non-deferral state, it must be filed within 180 days after the alleged unlawful employment practice occurred."  *Reed*, 667 Fed. Appx. at 610. (citing 42 U.S.C. § 2000e–5(e)(1)); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1214 n.2 (11th Cir. 2001) (explaining distinction between deferral and non-deferral states).  "Failure to file a timely charge with the EEOC generally results in a bar of the claims contained in the untimely charge."  *Reed*, 677 Fed. Appx. at 610 (citing *Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000)).

When Mr. Stewart filed his EEOC charge on August 31, 2018, the 180-day lookback captured Covanta's conduct between March 4, 2018 and August 31, 2018. Because Alabama is a non-deferral state, Mr. Stewart cannot recover damages for Covanta's pre-March 4, 2018 conduct.  Mr. Stewart does not contend otherwise. Accordingly, Mr. Stewart can recover damages for race discrimination relating to Covanta's July 2018 decision to promote Mr. Monahan to LEO rather than him, but he may not recover damages for Covanta's failure to create an LEO position for him in 2017.

As it relates to his Title VII retaliation claim, Covanta correctly contends that Mr. Stewart did not exhaust his pre-EEOC charge complaints of retaliation.  (Doc. 31-1, pp. 15–16).  Mr. Stewart did not check the retaliation box in his EEOC charge,

(Doc. 1-1, p. 2), and he did not allege facts concerning retaliation in his charge. Covanta does not challenge the propriety of Mr. Stewart's Title VII retaliation claim relating to his EEOC charge. Covanta states that "the only claims [Mr.] Stewart has raised that he has not also failed to exhaust are his claim that the promotion of [Mr.] Monahan was discriminatory and his claim (if any) for retaliation in response to his EEOC complaint." (Doc. 31-1, p. 16 n.3).[14]

Accordingly, only Mr. Stewart's Title VII failure-to-promote race discrimination claim concerning the 2018 LEO position and his Title VII retaliation claim relating to the filing of his EEOC charge are properly before the Court.

### B. Title VII Discrimination

Mr. Stewart's Title VII race discrimination claim rests on circumstantial evidence. So does his § 1981 race discrimination claim. Therefore, the analysis that follows applies to both claims.[15]

---

[14] Based on this statement, Covanta has waived the argument that Mr. Stewart's Title VII retaliation claim relating to his EEOC charge is not exhausted. The EEOC claim-filing requirement is a nonjurisdictional claim-processing rule. *Fort Bend Cnty., Tex. v. Davis*, 139 S.Ct. 1843, 1851 (2019). While the claim-processing rule "may be 'mandatory' in the sense that a court must enforce the rule if a party 'properly raise[s]' it . . ., an objection based on a mandatory claim-processing rule may be forfeited 'if the party asserting the rule waits too long to raise the point.'" *Davis*, 139 S.Ct. at 1849 (quoting *Eberhart v. United States*, 546 U.S. 12, 15, 19 (2005)).

[15] In his complaint, Mr. Stewart did not indicate whether he alleges a single-motive or a mixed-motive Title VII discrimination claim. He was under no obligation to plead one or the other in his complaint. *Williams v. Housing Auth. of Savannah, Inc.*, 834 Fed. Appx. 482, 489 (11th Cir. 2020). Besides a passing reference to the availability of the "motivating factor" test, (Doc. 35, p. 11), the parties' summary judgment briefs do not suggest that Mr. Stewart is pursuing a mixed-motive discrimination claim. Accordingly, the Court analyzes Mr. Stewart's claim as a single-motive

"In the absence of direct evidence of discrimination, a plaintiff can prove a discrimination claim or a retaliation claim under Title VII through circumstantial evidence," which courts may analyze "using the three-step, burden-shifting framework established in *McDonnell Douglas* [*Corp.*] *v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Sprowl v. Mercedes-Benz U.S. Int'l, Inc.*, 815 Fed. Appx. 473, 479 (11th Cir. 2020) (some citations omitted). "To succeed under this framework, a plaintiff must first present enough evidence to establish a *prima facie* case of discrimination; the employer then has the burden of production to articulate legitimate, nondiscriminatory reasons for the adverse employment action; and then the plaintiff must prove that those reasons were pretext." *Sprowl*, 815 Fed. Appx. at 479 (citing *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002)).

"Under the third step of the *McDonnell-Douglas* framework, the court must consider all the evidence to determine if a reasonable factfinder could conclude that the employer's legitimate reasons for the adverse conduct were pretext for discrimination." *Sprowl*, 815 Fed. Appx. at 479 (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). "The burden to prove pretext is on

---

Title VII discrimination claim such that he must prove that race discrimination was the "but-for" cause of Covanta's decision not to promote him to the LEO position in 2018. *See Williams*, 834 Fed. Appx. at 489. As discussed below, Mr. Stewart also must establish but-for causation for his § 1981 claim.

the plaintiff." *Sprowl*, 815 Fed. Appx. at 479 (citing *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018)).  "An employer's proffered reason for the adverse action is not pretext for discrimination unless the plaintiff can show '*both* that the reason was false, *and* that discrimination was the real reason.'" *Sprowl*, 815 Fed. Appx. at 479 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in *Hicks*)).  "A plaintiff may establish pretext by showing that 'the legitimate nondiscrimination reasons should not be believed' or that 'discriminatory reasons more likely motivated the decision than the proffered reasons.'" *Sprowl*, 815 Fed. Appx. at 479 (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1332 (11th Cir. 1998)).

"'[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII cases." *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  "The critical decision that must be made is whether the plaintiff has 'create[d] a triable issue concerning the employer's discriminatory intent.'" *Flowers*, 803 F.3d at 1336 (quoting *Smith*, 644 F.3d at 1328).  A "convincing mosaic" of circumstantial evidence "may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements …, and other bits and pieces from which an inference of discriminatory

intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) (citations omitted).

In its summary judgment brief, Covanta focuses on the *McDonnell Douglas* framework rather than the *Lockheed-Martin* convincing mosaic test for circumstantial evidence. Because Mr. Stewart's evidence of discriminatory animus concerns bits and pieces of evidence that he attempts to weave together to create a question of fact concerning Covanta's intent, (Doc. 35, pp. 7–8), the Court evaluates that evidence under the convincing mosaic standard.[16]

---

[16] One aspect of Covanta's burden-shifting argument deserves mention. Covanta argues that Mr. Stewart has not established a *prima facie* case of race discrimination. A *prima facie* failure-to-promote case has four elements. The employee must show that: "(i) he . . . belonged to a protected class; (ii) he . . . was qualified for and applied for a position that the employer was seeking to fill; (iii) despite qualifications, he . . . was rejected; and (iv) the position was filled with an individual outside the protected class." *Vessels v. Atl. Indep. Sch. Sys.*, 408 F.3d 763, 768 (11th Cir. 2005) (citing *McDonnell Douglas*, 411 U.S. at 802). Mr. Stewart has established his *prima facie* race discrimination case. He belongs to a protected class because he is Black. (Doc. 23-25, p. 1). He was qualified for and applied for the LEO position that Covanta sought to fill. Though Mr. Stewart was qualified, Covanta did not promote him to the LEO position. (*See* Doc. 23-22, p. 1). Instead, Covanta promoted Ronald Monahan who is a white man. (Doc. 1, p. 5, ¶ 23; Doc. 7, p. 3, ¶ 23).

Covanta challenges Mr. Stewart's qualifications for the LEO position relative to Mr. Monahan's qualifications, (Doc. 31-1, p. 17), but the point is irrelevant at the *McDonnell Douglas prima facie* stage of a failure-to-promote case. Covanta acknowledges that Mr. Stewart met the minimum requirements for the LEO promotion. Those requirements were that an applicant have a high school diploma or a GED, a minimum of five years of experience on the tipping floor or operating heavy equipment, a desire and ability to provide leadership and mediate conflicts, and basic computer skills. To be qualified, an applicant had to be working as an EO. (Doc. 23-21, p. 1). Mr. Stewart satisfied these criteria for the LEO position.

Mr. Stewart argues that Covanta "violate[d] its own policies and procedures to promote an unqualified employee to benefit one race over another."  (Doc. 35, p. 16).  "A defendant's failure to follow its own policies, as well as selective application or enforcement of its policies, can be evidence of pretext."  *R&R Ground Maint. Inc. v. Ala. Power Co.*, 713 Fed. Appx. 853, 858 (11th Cir. 2017).  "Departures from normal procedures may be suggestive of discrimination" where the departure occurs in a discriminatory manner.  *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985).

Mr. Stewart points out that under Covanta's "Promotion and Selection Process" policy, Mr. Monahan was not eligible for the LEO position in the summer of 2018.  (Doc. 35, pp. 16–17).  Mr. Stewart is correct.  The "Promotion and Selection Process (For Internal Candidates)" section of Covanta's employee manual states:  "An employee must be in his/her current position for a minimum of twelve (12) months to be eligible to apply for a posted position.  In addition the employee must stay in the new position for 12 months before he/she is eligible to apply for or 'post' on another position."  (Doc. 34, p. 14).  Because Mr. Monahan began working at Covanta Huntsville in May 2018, two months before Covanta posted the LEO position, he was not in his Huntsville EO position for 12 months before he applied for the LEO position.  (Doc. 35, p. 3).

Covanta argues that two provisions in its employee manual permitted it to consider Mr. Monahan for the LEO position.  First, Covanta points to the "Rehires-Bridging of Service" provision which states:

> **When a prior employee rejoins Covanta after a break in service that is one (1) year or less, the Company will give credit to the rehired employee for prior service.**  The "adjusted hire date" will provide the employee with applicable benefits based on this date.

(Doc. 34, p. 13) (emphasis in handbook).  Covanta also points to the last sentence in the "Promotion and Selection Process (For Internal Candidates)" provision which states:  "The Company reserves the right to grant individual exceptions based on business needs."  (Doc. 34, p. 14).

Relying on the "Rehires" provision, Covanta contends that because Mr. Monahan left Covanta's Massachusetts operation in October 2017 and returned to Covanta Huntsville in May 2018, Mr. Monahan "was eligible to have been reinstated and treated as if he had never left."  (Doc. 40, pp. 6–7) (citing Doc. 24-9, p. 13).  But the "Rehires" policy concerns "[b]enefits eligibility" and provides that an employee who has a break in service for fewer than 12 months will receive "credit . . . for prior service" for purposes of calculating benefits.  Benefits are distinct from eligibility for promotion.  In any event, Mr. Monahan was not an EO when he left Covanta's Massachusetts operation in 2017; he was a transfer station lead.  (Doc. 29-5, p. 13).  Therefore, even if Mr. Monahan could have the benefit of Covanta's "Rehires"

provision, he still would not have been an EO for the 12 months preceding his LEO application.   Consequently, under Covanta's internal promotion policy, Mr. Monahan was not eligible for the LEO position in the summer of 2018.

Covanta's employee manual does allow the company to grant individual exceptions to its 12-month promotion eligibility rule based on business needs.  (Doc. 34, p. 14).  But the record does not show that Covanta applied the exception for Mr. Monahan or that it had a legitimate business need that would allow it to exercise the exception.  If Covanta had followed its promotion policy for internal candidates and eliminated Mr. Monahan from contention for the 2018 LEO position, Covanta still would have had three EO candidates for the LEO position:   Mr. Stewart, Mr. Partrick, and Mr. Perry.  The trouble for Covanta is that its internal promotion policy required it to "consider the applicants' qualifications, abilities and past work performance," (Doc. 34, p. 14), and Mr. Partrick and Mr. Perry had only two years of EO experience as compared to Mr. Stewart's 20+ years of experience.  (Doc. 24-9, pp. 5, 9).  If Covanta were to follow its policy requiring it to consider for internal promotions all applicants' qualifications, abilities, and past work experience, only Mr. Monahan could compete with Mr. Stewart's tenure and experience with Covanta. So in that sense, Mr. Walton needed Mr. Monahan if he did not want to hire Mr. Stewart as LEO.

In this context, jurors could find particularly curious Covanta's decision to hire Mr. Monahan as an EO sometime in May 2018 after the company twice declined to hire him as an EO in 2017.  Covanta Huntsville declined to interview Mr. Monahan when he applied for an EO position early in 2017 because he was overqualified "as he had already served in a Lead position at a different Covanta facility."  (Doc. 38, p. 2, ¶ 4).  Covanta interviewed Mr. Monahan for an EO position that the company created later in 2017 but did not offer him the position because he "was *overqualified* for this position given his prior experience."  (Doc. 38, p. 2, ¶ 5) (emphasis in declaration).  Covanta Huntsville reversed course within weeks of Mr. Stewart's May 3, 2018 "serious near-miss on the Tipping Floor" when EO Tyler Buchanan, while operating a forklift, nearly ran over Mr. Stewart's foot.  (Doc. 24, p. 7, ¶ 19; Doc. 25, p. 16, ¶ 50; Doc. 25-11, p. 1).

The May 3rd incident triggered conversations among Mr. Walton, Ms. Pruett, and Kevin Pliska, Mr. Walton's direct supervisor, "to assess the Facility's tipping floor operations."  (Doc. 24, p. 7, ¶ 22).  According to Mr. Walton, "[a]t one point," almost certainly in May 2018, Mr. Pliska asked "who our lead person on the tipping floor was. I told him that we did not have a lead.  Mr. Pliska reacted immediately: 'You need a lead.' Mr. Pliska was pretty adamant about the decision and clear that this needed to change."  (Doc. 24, p. 7, ¶ 22).  By June 11, 2018, Mr. Walton was working with HR to create the LEO position.  (Doc. 24-4, p. 2).  Viewed in the light

most favorable to Mr. Stewart, the evidence indicates that after Mr. Pliska directed Mr. Walton to create an EO position, Covanta Huntsville hired Mr. Monahan as an EO, and then Mr. Walton made the decision to interview only Covanta Huntsville EOs for the LEO position.  (Doc. 24-8, p. 8, ¶ 26).  Jurors could conclude that the LEO position was a lock for Mr. Monahan, save the Covanta internal promotion policy which Mr. Walton opted to ignore.  Only after Mr. Stewart sued Covanta did Covanta suggest that it had a business need for Mr. Monahan's LEO application, and it did not name the business need.[17]

Assuming, for argument's sake, that Covanta had a legitimate business need that required it to bend the 12-month eligibility rule for Mr. Monahan, Covanta overlooks the fact that the business need provision in its internal promotion policy cuts two ways.  Covanta could have used the exception to offer the LEO position directly to Mr. Stewart without posting the position.  In fact, the company did not have to tap the business need exception to skip the posting process because

---

[17] Two other bits of evidence suggest that Covanta Huntsville hired Mr. Monahan as an EO in anticipation of the creation of the LEO position.  First, there is a notable contrast between Mr. Monahan's application for the LEO position and the applications that the three other eligible EOs submitted.  Mr. Monahan submitted a three-sentence cover letter and an informal resume.  (Doc. 24-9, pp. 12–13).  Mr. Stewart, Mr. Perry, and Mr. Partrick submitted formal letters and resumes.  (Doc. 24-9, pp. 1–11).  Jurors could infer from the contrast that Mr. Monahan put little effort into his LEO application because he knew the application for the promotion was a mere formality.  Second, Mr. Walton explained that four out of five EOs applied for the LEO position.  (Doc. 24, p. 9, ¶ 28).  The fifth, Tyler Buchanan, was "deemed . . . ineligible for the promotion due to recent discipline he had received."  (Doc. 31-1, p. 11 n.2).  But Mr. Monahan also was ineligible based on the internal promotion 12-month rule.  Still, Covanta disregarded the fact that Mr. Monahan was not eligible for the LEO position.

Covanta's internal promotion policy states: "Job openings will be posted online, available on Covanta Connect.  From time to time, however, the Company may fill job openings without posting."  (Doc. 34, p. 14).  Mr. Walton could have given Mr. Stewart the LEO position that Mr. Wilson had promised him – the job that he already was performing without the title or LEO wage, but Mr. Walton chose to post the position.   Viewing this evidence in the light most favorable to Mr. Stewart, Covanta's post-hoc, one-sided application of its business need provision is evidence of discriminatory intent.  The record contains ample evidence from which jurors could conclude that Covanta violated its internal promotion policy when Mr. Walton deemed Mr. Monahan eligible for the LEO position two months into his tenure at Covanta Huntsville.  (*See* Doc. 40, p. 7).

From this same evidence, jurors also could conclude that Covanta systematically treated two similarly situated employees, Mr. Monahan and Mr. Stewart, differently.  In terms of company tenure, Mr. Monahan was Mr. Stewart's junior, but only by a little more than one year.  (Doc. 24-9, pp. 2, 13).  Mr. Monahan spent most of his career with Covanta as an equipment operator, and Mr. Stewart spent his entire career with Covanta as an equipment operator.  (Doc. 24-9, pp. 2, 13).  Mr. Monahan served as a Transfer Station Lead for three years in Massachusetts before moving to Alabama, and Mr. Stewart acted as the LEO at Covanta Huntsville at least beginning in 2016, though he did not have a formal LEO title or wage.  (Doc.

24-9, p. 13; Doc. 25-1, pp. 1–7).  For years, Mr. Stewart also held a seat on Covanta Huntsville's VPP Safety Committee, serving one year as president of the committee. (Doc. 23-8, pp. 2, 4 (2006 review); Doc. 23-9, p. 2 (2007 review); Doc. 23-10, pp. 2, 4 (2008 review); Doc. 23-11, p. 1 (2009 review); Doc. 23-15, p. 3 (2015 review)). In all relevant respects, Mr. Stewart and Mr. Monahan were equal in their experience, with Mr. Stewart having the advantage of having worked at Covanta Huntsville for more than 20 years and Mr. Monahan having the advantage of serving in a lead position in an official capacity.  Yet, Covanta Huntsville overlooked the fact that Mr. Monahan, the white employee, left the company for several months and made an exception to company policy to allow him to apply for the Huntsville LEO position, while Covanta reneged on its assurance to Mr. Stewart, its Black employee, that if Huntsville formally created an LEO position, it would be his, a promotion that Covanta could make consistent with its internal promotion policy.

The record contains other evidence of Covanta's disparate treatment of similarly situated employees.  The evidence, viewed in the light most favorable to Mr. Stewart, indicates that he complained to Ms. Pruett that he was performing as an LEO without being compensated for the work while white employees performing lead duties were compensated for lead work.  The record bears out Mr. Stewart's complaint.  Mr. Walton explained that there was a mechanical lead position at Covanta Huntsville before Covanta created the LEO position in Huntsville.  Mr.

Walton stated that one of the employees in the mechanical department, Mr. Givens, would, from time-to-time, step up and serve as lead of the department. When he did, Mr. Givens "would receive the lead position's pay for all hours worked in that position." (Doc. 24, p. 13).[18] Mr. Givens is white. Mr. Stewart, who is Black, was not paid a lead wage when he performed lead duties. Ms. Pruett acknowledged as much when she asked in 2017 that Mr. Stewart be given financial recognition for his work, stating: "I would like to see us at least do something with [Mr. Stewart's] rate of pay or bonus that would reward him for his contributions above and beyond the norm." (Doc. 25-2, p. 1).[19]

The evidence, viewed in the light most favorable to Mr. Stewart, also demonstrates that white EOs quickly received promotions, but Mr. Stewart, the only Black EO, did not. In late 2017, while Mr. Stewart was on leave, Ms. Pruett began handing off her quality assurance responsibilities to Mr. Partrick, a Covanta employee with two-years' experience as an EO and a total of seven years' experience with the company. (Doc. 24, p. 4; Doc. 25-9, p. 5). A few months after Covanta filled the LEO position, Covanta posted a formal quality control position for the

---

[18] When Mr. Givens's predecessor retired, he applied for the mechanical lead position and received the promotion. He was the only applicant for the position. (Doc. 24, p. 14).

[19] Ms. Coppedge responded that Mr. Stewart already was at the high wage end for EOs, but that is because he had worked for Covanta as an EO for 20+ years. Covanta paid Mr. Partrick, who had worked as an EO for two years, only 45 cents per hour less than Mr. Stewart. (Doc. 24-4, p. 2).

Huntsville facility, and Mr. Partrick was promoted to that position.  (Doc. 24, p. 14).[20]

Also, while Mr. Stewart was on medical leave in late 2017, Covanta hired a new EO, Jacob Holt, and five months later, Covanta promoted Mr. Holt to an auxiliary operator position.  (Doc. 23, p. 247; Doc. 24, p. 14; Doc. 39, pp. 1–2, ¶ 3).  Mr. Walton explained that Mr. Holt "had completed all of the training required for the position," and Covanta "had an immediate need to fill that position that was critical to operations.  This was consistent with our handbook policy, which 'reserves the right to grant individual exceptions based on business needs.'"  (Doc. 39, p. 3, ¶ 3).   But again, Covanta never found a business need for promoting Mr. Stewart on an accelerated basis or otherwise.  Indeed, in his 2017 review, after Ms. Pruett and Mr. Wilson were unable to persuade Mr. Ball-Lovera to create an LEO position in Huntsville, Ms. Pruett wrote that "[s]ince there is not a 'next level' within Tipping Floor Operations, Terrence could be ready for an advancement into Operations or Maintenance within 1-2 years (if desired)," and he would need specialized training.  (Doc. 25-5, pp. 4–5).  Thus, Covanta was willing to use its business needs rule to expedite a promotion for a white employee, but the company offered no such opportunity to Mr. Stewart.  Mr. Stewart worked for Covanta for more than two

---

[20] In seven years, Mr. Partrick had received three promotions before he was elevated to the new quality assurance position.  (Doc. 25-9, p. 5).

decades without receiving a promotion.  In fact, when he first complained of race discrimination, Mr. Stewart told Ms. Pruett that he was "the only long-time Huntsville employee that had not ever been promoted."  (Doc. 25-3, p. 3).

Covanta points out that Mr. Stewart did not apply for several of the promotions that other EOs received.  But Mr. Partrick and Mr. Holt and Mr. Givens in mechanical, three white Covanta employees, were selected and trained for the positions to which they were promoted before they applied for the positions.  In 20+ years, only Ms. Pruett offered Mr. Stewart that opportunity, and after he trained with her and met the goals she set, Covanta refused to create a position for him.  One year later, when Covanta changed course and created the LEO position, the company brought in a white EO whose experience matched Mr. Stewart's, depriving him of the advantage that Covanta routinely gave white employees.[21]  Through this evidence, Mr. Stewart can demonstrate that Covanta systematically favored white EOs with advantages that Covanta did not give him.

---

[21] Covanta also argues that Mr. Stewart "was unlikely to get the Lead Operator Equipment position even without [Mr.] Monahan in the running.  After all, [Mr.] Stewart performed worse than all three applicants on the interview process."  (Doc. 40, p. 7 n.1).  But Covanta promoted Mr. Monahan, not the other applicants.  If Mr. Monahan were not in the picture, then Covanta would have had to promote to supervise Mr. Stewart an EO with two-years' experience.  That is a difficult scenario to imagine, particularly given Mr. Stewart's 2016 and 2017 reviews in which he consistently was scored as exceeding expectations and even as expert in several categories.

The other categories of circumstantial evidence that Mr. Stewart cites do not help him establish discriminatory intent. For example, Mr. Stewart points to the number of Black employees that Covanta hired in Huntsville. Of approximately 40 Covanta Huntsville employees, fewer than five are Black. (Doc. 1, p. 7, ¶ 32).[22] Mr. Stewart testified that over his first 20 years at Covanta, the company did not hire a Black employee. (Doc. 23, p. 297).[23] But the Eleventh Circuit has explained that statistics are meaningless without context. *Brown v. Am. Honda Motor Co.,* 939 F.2d 946, 952 (11th Cir. 1991) (statistics without a proper analytic foundation are "virtually meaningless"); *Kilpatrick v. Tyson Food, Inc.*, 268 Fed. Appx. 860, 863 (11th Cir. 2008) (same). Mr. Stewart has provided no context for his statistics. He has not presented evidence that establishes how many non-white individuals applied for positions at Covanta over the years. Without context, the Court cannot determine whether Mr. Stewart's statistics are evidence of discrimination or not.

But, on balance, Mr. Stewart's evidence, viewed in the light most favorable to him and "viewed as a whole," creates "'a convincing mosaic of circumstantial

---

[22] Covanta admitted this fact in its answer. (Doc. 7, p. 4, ¶ 32).

[23] In his complaint, Mr. Stewart alleges that Covanta had hired approximately 27 White/Caucasian employees and one Black/African American employee during his tenure. (Doc. 1, p. 7, ¶ 31). Covanta denies this allegation. (Doc. 7, p. 4, ¶ 31). Mr. Walton asserts that his new hiring procedures "resulted in increasing diversity in hiring: since I became Facility Manager a little over three years ago, we have hired three African-American or Black applicants and one Hispanic applicant." (Doc. 24, p. 15, ¶ 48). Mr. Stewart acknowledges the recent hires. (Doc. 23, p. 297). The Court cannot tell from the record whether these hires occurred before or after Mr. Stewart filed his lawsuit.

evidence that would allow a jury to infer intentional discrimination'" related to Covanta's decision to promote Mr. Monahan to LEO in 2018.  *Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012) (quoting *Lockheed-Martin*, 644 F.3d at 1328).

### C. Title VII Retaliation

"For a [Title VII] retaliation claim that relies on circumstantial evidence, like this one, we apply the *McDonnell Douglas* burden-shifting analysis." *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1277 (11th Cir. 2021) (citing *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020)).  "Under that framework, the plaintiff establishes a prima facie case of retaliation if he demonstrates (1) he participated in a statutorily protected activity; (2) he experienced an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action." *Bailey*, 992 F.3d at 1277 (citing *Johnson*, 948 F.3d at 1325).  "If the plaintiff makes out a prima facie case, the burden shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for its employment decision." *Bailey*, 992 F.3d at 1277 (citing *Johnson*, 948 F.3d at 1325). "And if the defendant does so, the burden shifts back to the plaintiff to show that the defendant's stated reason was not the real reason for its decision but rather, served as pretext for retaliation." *Bailey*, 992 F.3d at 1277 (citing *Johnson*, 948 F.3d at 1325).  For retaliation claims, "a plaintiff must demonstrate that his participation in protected activity was the 'but-for' cause of the adverse employment action."

*Bailey*, 992 F.3d at 1277 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

"The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N.*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Mr. Stewart engaged in statutorily protected activity when he filed his EEOC charge of discrimination. Mr. Stewart signed his charge on August 31, 2018, and the charge is stamped "RECEIVED  U.S. EEOC" on September 4, 2018. (Doc. 23-25, p. 1). In his complaint, and his brief in opposition to Covanta's motion for summary judgment, Mr. Stewart identifies only one possible adverse employment action that occurred after he filed his EEOC charge:  Covanta gave him "an inaccurate and low evaluation because he complained of race discrimination." (Doc. 1, p. 10, ¶ 46). In his opposition to Covanta's motion for summary judgment, Mr. Stewart simply states that "[t]here is no doubt the Plaintiff engaged in statutorily protected activity which results in a retaliatory response by Covanta." (Doc. 35, p. 19).

47

The Eleventh Circuit Court of Appeals has held that a low or negative performance evaluation, by itself, is not an adverse employment action. *See Johnson*, 948 F.3d at 1326–27 (concluding that negative monthly evaluations were not a material adverse employment action because the appellant did not explain how the evaluations affected the terms and conditions of his employment "or allege why a reasonable worker in his shoes would have been dissuaded from reporting allegedly retaliatory conduct because of those negative evaluations."); *Martin v. Eli Lilly & Co.*, 702 Fed. Appx. 952, 956 (11th Cir. 2017) ("Negative performance evaluations, standing alone, do not constitute adverse employment action, and courts are wisely reluctant to treat job performance memoranda as actionable … where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline.") (internal quotations and citations omitted); *Brown v. Snow*, 440 F.3d 1259, 1265 (11th Cir. 2006) ("A lower score on Brown's performance evaluation, by itself, is not actionable under Title VII unless Brown can establish that the lower score led to a more tangible form of adverse action, such as ineligibility for promotional opportunities."). For Mr. Stewart's 2018 performance evaluation to be an adverse employment action, he must demonstrate the evaluation harmed him in some way.

The Court has not found evidence in the record that indicates that Mr. Stewart's pay was reduced because of his 2018 evaluation or that he suffered another

48

concrete consequence of the evaluation. Because there is no evidence that Mr. Stewart's 2018 evaluation triggered "any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline," *Martin*, 702 Fed. Appx. at 956, Mr. Stewart's Title VII retaliation claim fails as a matter of law.

**Mr. Stewart's § 1981 Claims**

Claims arising under § 1981 resemble those arising under Title VII. Section 1981 creates a federal right of action to challenge racial discrimination and guarantees to all citizens "the same right to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). A plaintiff does not have to exhaust administrative remedies before filing a § 1981 action; he must simply file "within the four-year statute of limitations prescribed by 28 U.S.C. § 1658." *Chandler v. Volunteers of Am., N. Ala., Inc.*, 598 Fed. Appx. 655, 665 (11th Cir. 2015) (citing *Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1338–39 (11th Cir. 2008)). Thus, with respect to Mr. Stewart's § 1981 claims, he may claim damages for conduct dating back to 2017.

**A. Section 1981 Discrimination**

As noted above, Mr. Stewart's Title VII and § 1981 race discrimination claims relating to the 2018 LEO position rest on the same circumstantial evidence, so the Court's analysis of Mr. Stewart's evidence applies to both claims, meaning that Mr. Stewart has identified disputed questions of fact as to both claims concerning the 2018 position.  Because Mr. Stewart's § 1981 discrimination claim is not subject to the time limits that apply to his Title VII race discrimination claim, the Court must evaluate whether Mr. Stewart can identify a disputed issue of material fact concerning Covanta's failure to create an LEO position for the Huntsville tipping floor in 2017.

The Eleventh Circuit Court of Appeals has explained that a failure-to-promote claim fails when the plaintiff cannot demonstrate that the job existed.  *See Hogan v. South Ga. Med. Center*, 749 Fed. Appx. 924, 930 (11th Cir. 2018) (citing *Walker v. Mortham*, 158 F.3d 1177, 1191–92 (11th Cir. 1998)); *see also Brand v. Henry Cnty. Bd. of Educ.*, No. 1:17-cv-823-ALB, 2020 WL 889316, at *3 (M.D. Ala. Feb. 24, 2020) (citing *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1137 (10th Cir. 2004) ("An employer's failure to promote a plaintiff to a non-existent position is not enough to support a presumption of intentional racial discrimination.")).

The evidence establishes that in 2017, Covanta did not have an LEO position at its plant in Huntsville.  Mr. Wilson and Ms. Pruett pressed their supervisors to create an LEO position for Mr. Stewart or to at least give him a raise to recognize his significant accomplishments as an outstanding EO at Covanta Huntsville.  Ms. Coppedge in Covanta's HR department supported the effort.  Ultimately, the effort failed because Mr. Ball-Llovera, after consulting with Mr. Wilson, Ms. Pruett, and Mr. Spence, decided not to create an LEO position in 2017.  Mr. Stewart testified that he had met Mr. Ball-Llovera "way before I asked about that lead position.  He would come [to the Huntsville facility] with the safety guy."  (Doc. 23, pp. 140-41).  Therefore, jurors could infer that Mr. Ball-Llovera knew that Mr. Stewart is Black.  But jurors would have to conclude that there was not an LEO position in Huntsville in 2017 because that evidence is undisputed.  Therefore, under *Hogan*, Mr. Stewart may not pursue a race discrimination claim for damages under § 1981 based on Covanta's failure to create an LEO position in Huntsville in 2017.

B. **Section 1981 Retaliation**

"To establish a retaliation claim under § 1981, a plaintiff must prove that (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) there was some causal relation between the two events."  *Hayes v. ATL Hawks, LLC*, 844 Fed. Appx. 171, 183 (11th Cir. 2021) (citing *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1276 (11th Cir. 2008)).

51

"A plaintiff engages in a statutorily protected activity when he asserts a right encompassed by § 1981." *Hayes*, 844 Fed. Appx. at 183 (citing *Jiminez v. Wellstar Health Sys.*, 596 F.3d 1304, 1311 (11th Cir. 2010)).   "Statutorily protected expression includes internal complaints . . . to superiors as well as complaints lodged with the EEOC . . . ." *Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197, 1201 (11th Cir. 2001).  "[T]he protection afforded . . . is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) (citing *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981); *Sias v. City Demonstration Agency*, 588 F.2d 692, 694–96 (9th Cir. 1978)).  Mr. Stewart engaged in statutorily protected activity when he complained to Ms. Pruett in January 2018 that he felt Covanta was discriminating against him because he is Black and when he discussed his concerns about discrimination with Mr. Walton a few days later.

Mr. Stewart suffered an adverse employment action after he complained to Ms. Pruett:  Covanta promoted Mr. Monahan instead of him to the LEO position. The Eleventh Circuit Court of Appeals has explained that "an adverse employment action requires a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits." *McCone v. Pitney Bowes, Inc.*, 582 Fed. Appx. 798, 800 (11th Cir. 2014) (citing *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001)).

Mr. Stewart may demonstrate a causal relation by showing close temporal proximity between statutorily protected activity and a retaliatory action, but "temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). A mosaic of circumstantial evidence will suffice to establish causation if the circumstantial evidence raises a reasonable inference that Covanta took an adverse action against Mr. Stewart to retaliate against him for engaging in protected activity. Regardless of how Mr. Stewart proves causation, he must proffer evidence "that the desire to retaliate was the but-for cause of the challenged [retaliatory] action." *Nassar*, 570 U.S. at 532.

Covanta promoted Mr. Monahan in July 2018, six months after Mr. Stewart complained that he felt discriminated against. Mr. Walton, who made the decision to promote Mr. Monahan, spoke to Mr. Stewart in January of 2018 after Ms. Pruett conveyed Mr. Stewart's complaint about discrimination. After Mr. Walton spoke to Mr. Stewart, he wrote to Ms. Coppedge: "Hopefully, the conversation will help to heal any wounds he may have and we won't hear anymore about it." (Doc. 24-2, p. 1). The "it" was Mr. Stewart's complaint of racial discrimination. Mr. Stewart's

complaint, coupled with Mr. Walton's desire to not hear any more about race discrimination at Covanta, yields a reasonable inference that Covanta retaliated against Mr. Stewart by failing to promote him to the LEO position as does the evidence concerning the circumstances surrounding Covanta's hiring and promotion of Mr. Monahan.   The evidence, viewed as a whole, permits the inference that Covanta hired Mr. Monahan and promoted him to LEO to retaliate against Mr. Stewart for complaining about race discrimination after Covanta refused to create an LEO position for him in 2017.

## CONCLUSION

For the reasons above, the Court grants Covanta's motion for summary judgment with respect to Mr. Stewart's Title VII and § 1981 race discrimination claim concerning the company's failure to create an LEO position in 2017 and with respect to Mr. Stewart's Title VII retaliation claim.   The Court denies the motion with respect to Mr. Stewart's Title VII and § 1981 race discrimination claim concerning the company's failure to promote him to the new LEO position in 2018 and with respect to Mr. Stewart's § 1981 retaliation claim.   A jury must decide whether Covanta promoted Mr. Monahan rather than Mr. Stewart because Covanta intended to discriminate against Mr. Stewart because he is Black or because Covanta wished to retaliate against Mr. Stewart for complaining about race discrimination at the company or for a reason unrelated to Mr. Stewart's race or his complaints.

**DONE** and **ORDERED** this August 23, 2021.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE